The Full Commission modifies this award to resolve the inconsistency in plaintiff's testimony concerning his earnings in the fall of 1993 between his detailed recollection of payments per service, and their frequency, and his estimate of his net "take home" out of the wages paid. In addition, the term of payment of temporary partial disability benefit is extended because, as found by the hearing Deputy (Findings of Fact #22 and #24), it was a non-compensable hernia — not a change in condition related to the compensable injury — that caused plaintiff to stop working in November, 1993. Finally, in light of the equivocal medical evidence received after the testimony before the Deputy Commissioner, the award is based on the situation as it stood on the date of that testimony.
Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good ground to receive further evidence or rehear the parties or their representatives, the Full Commission MODIFIES and AFFIRMS the Opinion and Award of the Deputy Commissioner as follows:
The Full Commission finds as facts and concludes as matters of law the following which were entered into by the parties at the hearing before the Deputy Commissioner and in the Form 21 agreement of payment for compensation as:
STIPULATIONS
1. At all times relevant to this claim, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act, and an employer-employee relationship existed between plaintiff and defendant-employer.
2. St. Paul Fire and Marine Insurance Company is the compensation carrier on the risk.
3. On 11 May 1992, plaintiff sustained an injury by accident arising out of and in the course and scope of his employment with defendant-employer.
4. Said accident resulted in injury to plaintiff's lower back.
5. Plaintiff's average weekly wage at the time of injury was $550.00, yielding a compensation rate of $366.69 per week.
6. Defendants have accepted liability for plaintiff's injury on a Form 21 agreement approved by the Industrial Commission and defendants paid temporary total disability to plaintiff from 15 May 1992 until 26 March 1993, the date a Form 24 "stop payment" application was approved by the Industrial Commission.
* * * * * * * *
Based upon all of the competent evidence adduced at the hearing before the Deputy Commissioner and from the record herein, the Full Commission makes the following:
FINDINGS OF FACT
1. At the time of hearing, plaintiff, Terry L. Lewis, was fifty-one years old and had completed his GED during his three and a half years of service in the United States Navy.
2. Plaintiff has worked primarily in construction type jobs over the past twenty-five years. Over the fifteen year period from 1974 until 11 May 1992, plaintiff was employed with defendant-employer and held a number of positions with defendant-employer with increasing levels of responsibility.
3. On 11 May 1992, while plaintiff was walking at defendant-employer's construction site, his foot became caught in the scaffolding and he fell backwards flat on his back, hitting the edge of the scaffolding board with his back. Plaintiff immediately felt intense pain in his lower back, right leg and foot. The defendants accepted plaintiff's claim as compensable and entered into the appropriate agreements whereby defendant-carrier agreed to pay plaintiff compensation at the rate of $366.69 per week for "necessary weeks."
4. Plaintiff sought treatment initially with Dr. A. J. Osbahr, and, thereafter, his own family physician. Subsequently, defendant-employer referred plaintiff to Dr. George Ferre, an orthopedic surgeon with a subspecialty in spinal surgery.
5. Plaintiff began treatment with Dr. Ferre on 12 June 1992. Katherine Kitts, R.N., of Armstrong and Associates, a rehabilitation consultant hired by defendant-employer, accompanied plaintiff on many of his visits and also communicated directly with Dr. Ferre about plaintiff's medical treatment and his return to work status.
6. Dr. Ferre had treated plaintiff previously for several back injuries that were not work-related. Based upon objective findings from his examination and plaintiff's MRI results, Dr. Ferre diagnosed a new herniated disk at the L4-L5 level which was causing nerve root pressure. A lumbar laminectomy and excision were performed on plaintiff on 14 July 1992. Thereafter, plaintiff continued treatment with Dr. Ferre, reporting overall improvement, but recurrent pain in his lower back and right leg. Dr. Ferre performed surgery under local anesthesia on plaintiff on 8 January 1993 to correct a problem that he diagnosed as a tear in the lumbar fascia, the covering of muscle, that had been torn in plaintiff's 11 May 1992 fall. By February, 1993, Dr. Ferre felt that plaintiff was improving and that he would be able to return to light duty work in March. He advised plaintiff to increase his activities to condition himself for the return to work.
7. While plaintiff was out of work as directed by Dr. Ferre, the defendants hired InPhoto Investigation Service to surveil plaintiff on 7 February and 8 February 1993. InPhoto's investigator videotaped and observed plaintiff cutting limbs and branches with a seven and a half pound gas-powered chain saw, tossing some of the limbs aside, and throwing pieces of cut wood. The investigator cut the video recorder on and off during the course of the surveillance. A summary of the videotape was prepared by the investigators and submitted by defendants along with the Form 24 "stop payment" application to the Industrial Commission. Defendants did not submit a copy of plaintiff's medical records, or the actual videotape to the Industrial Commission along with their Form 24 "stop payment" application. The Industrial Commission approved the Form 24 application for "stop payment" on 26 March 1993 based solely upon the summary of the videotape.
8. During plaintiff's follow-up visit with Dr. Ferre on 19 February 1992, plaintiff complained of increased pain in his back and right leg. His examination revealed a considerable change in his range of motion; and, plaintiff was complaining of burning in his foot and leg and of muscle spasms in his back. An MRI was requested, and the results showed that plaintiff had more obstruction of the neural foramen at the L4-5 level due to surgical scarring. Dr. Ferre recommended surgery to alleviate this problem. Plaintiff was instructed to continue to remain out of work. Surgery was performed on plaintiff on 4 March 1993 at the L4-L5 disk level. Dr. Ferre found that plaintiff had scarring due to prior surgery and recurrent disk material right at the axilla of the nerve root where the nerve comes off the spinal canal. Dr. Ferre opined that the activities in which plaintiff engaged on 7 February and 8 February 1992 did not result in the third surgery, as it was necessary due to the surgical scarring, but that it may have aggravated plaintiff's pre-existing disk problems. Plaintiff improved significantly after the third surgery, and he was released to return to work on 12 April 1993 to light duty work.
9. A miscommunication over surgery authorization arose between the defendant-carrier and Dr. Ferre in February, 1993. Dr. Ferre notified the defendants that the third surgery would be necessary. The defendants received written notice in a 28 December 1992 letter. Defendants' rehabilitation nurse, Katherine Kitts, did not advise Dr. Ferre that surgery was not authorized until after surgery had been completed. Defendants have refused to pay for the third surgery and follow-up treatments provided by Dr. Ferre. Defendants did not arrange for plaintiff to receive treatment for his admittedly compensable injury with any other medical provider before or after February, 1993.
10. Defendants contend that plaintiff was able to return to work and should have returned to work by 7 February 1993 because he was able to engage in the type of activities depicted on the videotape. The undersigned finds, however, that plaintiff's activities on 7 February and 8 February 1993 were not indicative of an ability to return to full-time employment. At said time, plaintiff was engaged in activities that he had not been specifically restricted from doing by his treating physician. Dr. Ferre admitted that he told plaintiff to increase his activities, although he further stated that, in hindsight, he would not have advised plaintiff to engage in such activities.
11. According to Dr. Ferre, plaintiff's condition will require future medical maintenance and treatment. Dr. Ferre opined that plaintiff had a thirty percent (30%) permanent partial impairment of the back. Of that thirty percent (30%) rating, he attributed half of it to the 11 May 1992 work-related injury and the other half to plaintiff's preexisting nonwork-related injuries. He further opined that his permanent partial impairment rating would have been higher had plaintiff not had the 4 March 1993 surgery.
12. At defendants' request, plaintiff underwent an independent medical evaluation by Dr. William R. Griffin on 12 May 1993. Dr. Griffin is an orthopedic surgeon with special interest in spine and disability evaluations. Dr. Griffin found no evidence of symptom magnification on the part of plaintiff. Dr. Griffin found that plaintiff had sustained an injury to his back which was still not resolved. He felt that plaintiff had not reached maximum medical improvement as of 12 May 1993 and that plaintiff had a significantly deconditioned back. Dr. Griffin recommended that plaintiff be placed in a proper physical therapy program to help mobilize and strengthen his back and that plaintiff undergo a functional capacity evaluation to find out his appropriate level of functioning. He expressed doubt that plaintiff would be able to resume his previous employment and felt that plaintiff's long-term consumption of Vicodan, a prescribed narcotic, should be addressed prior to his return to work. Dr. Griffin opined that the 11 May 1992 work-related injury began a chain of events which ultimately required three more surgeries for the plaintiff. He opined that the first two surgeries did not seem to work; however, the third surgery appeared beneficial and that it is not uncommon to do exploratory surgery on areas where previous surgeries have been performed. Dr. Griffin declined to comment on the appropriateness of the surgery and treatment provided by Dr. Ferre.
13. Defendants rely heavily upon the videotape of 7 February and 8 February 1993 as the basis of their refusal to provide further compensation to the plaintiff. Corbett Lewis, plaintiff's son, who is employed with the South Carolina Law Enforcement Division testified that he and his father were cutting small dead trees and limbs during the taping of the video. He stated that he did not consider the activity strenuous and that he and his father at one time jumped up and down on the very small pile of branches which in many respects was like jumping on a cushion. The testimony of Corbett Lewis is accepted as credible.
14. Dr. Ferre, plaintiff's treating physician and the physician to whom plaintiff was referred by defendants, had not released plaintiff to return to work as of 7 February 1993. On 19 January 1993, he opined that plaintiff would likely be able to return to work in six weeks. Defendants have produced no competent evidence to refute Dr. Ferre's opinion. Rather than seeking a second medical opinion on plaintiff's ability to return to work, defendants retained a private investigator to videotape plaintiff's activities. Based on the evaluation of the Deputy Commissioner, no weight or credibility is accorded to any expressed or implied opinion of the private investigator on plaintiff's physical limitations or his ability to return to work.
15. Plaintiff was unable, due to his disability arising from his compensable injury, to return to work prior to 12 April 1993.
16. Plaintiff's activities of 7 February and 8 February 1993 did not cause the need for additional surgery and did not cause an additional period of disability. His activities could have aggravated his condition, but not significantly.
17. Plaintiff was unable as a result of his disability to return to work until 12 April 1993. At said time, he was able to return to light duty work which required lifting no more than twenty-five pounds and no repeated bending or stooping. No light duty work was offered to plaintiff even though he called defendant-employer on or about 7 April 1993 to advise of his release to return to light duty work. Plaintiff solicited and was given permission by defendant-employer to stay home until his surgery scar healed. In mid-April, 1993, plaintiff talked to the home office of defendant-employer in Birmingham, Alabama, and was assured that a job would be provided to him.
18. On 12 May 1993, plaintiff was directed by defendants to submit to an Independent Medical Evaluation by Dr. William R. Griffin, Jr., to determine if he had reached maximum medical improvement, his anticipated return to work date, and whether further treatment was recommended. Dr. Griffin opined that plaintiff had not reached maximum medical improvement, that he could not resume his previous employment, and that plaintiff should get appropriate physical therapy and a functional capacity evaluation. Defendants made no efforts to follow through with any of these recommendations that they had solicited.
19. Plaintiff, by letter from his attorney, advised defendant-employer on 1 June 1993 that plaintiff was available for light duty work. By letters dated 21 October 1993 and 4 January 1994, plaintiff was advised of employment which was available in Plymouth, North Carolina. Plaintiff requested that defendant-employer place the job requirements in writing so that he could get his doctor to verify that these duties were within his restrictions. Defendant-employer has not responded.
20. Plaintiff considered himself to be an employee of defendant-employer after he was released to return to work in April, 1993, because he was a member of defendant-employer's Gold Key Club and had been guaranteed 2000 hours of work during 1993.
21. Plaintiff, through his own efforts, found work with a cable company in late August, 1993, where he was paid by the job. He worked according to availability of job assignments over a period of approximately two months and earned gross wages of approximately $450.00 per week. Plaintiff stopped working on this job in November, 1993, after he became disabled due to a hernia.
22. Plaintiff's partial disability continued even though he found work with Southern Cable Tren of Columbia, South Carolina in late August, 1993. Plaintiff was paid $15.00 per apartment or house to install aerial cable TV wires. Plaintiff worked at about six sites a day, Monday through Friday and occasional Saturdays, setting up and working on a ladder to attach the cable to a pole, drilling a hole at the residence, and pulling the cable. At times he was assisted by another man. He earned an average weekly wage of $450.00. Defendant-employer did not offer light duty work to plaintiff which was within his restrictions. The greater weight of the credible testimony establishes that plaintiff had the capacity to earn wages of $450.00 per week beginning in late August, 1993.
23. Plaintiff developed a hernia in November, 1993, and was taken out of work until 1 January 1994. After his release to return to work on 1 January 1994, plaintiff had not located suitable employment as of the date of hearing on 13 January 1994.
24. Plaintiff was partially disabled from work from late August, 1993, until November, 1993, when he became totally disabled due to a new, non-work related hernia. He painted a room for his son over two days in December for $90.00. Plaintiff remained temporarily partially disabled as a result of the injury which is the subject of this claim through the date of the hearing before the Deputy Commissioner. Plaintiff's partial incapacity to earn wages after 1 January 1994, the date he was released to return to work after recovery from his hernia, was caused by the 11 May 1992 injury and not his hernia. There is no convincing evidence that his capacity to earn wages diminished due to the injury of 11 May 1993 between late August 1993 and the hearing before the Deputy Commissioner on 13 January 1994.
25. Dr. Ferre testified on 24 May 1994 that plaintiff retained the same capacity to work as he had the prior April, but was actively treating him with epidural steroid injections, following physical therapy that was discontinued due to discomfort. There is insufficient persuasive evidence to determine whether plaintiff's capacity to earn changed or if he reached maximum medical improvement after 13 January 1994.
26. The medical treatment provided to plaintiff by Dr. Ferre and the physical therapist was reasonably necessary to effect a cure, give relief, and/or lessen plaintiff's period of disability, and did give plaintiff relief from the consequences of the injury. Plaintiff sought approval in a timely fashion of that portion of their treatment that the defendant had not authorized, and same should be approved.
* * * * * * * *
The foregoing stipulations and findings of fact engender the following additional:
CONCLUSIONS OF LAW
1. As a result of his admittedly compensable injury, plaintiff suffered temporary total disability from 11 May 1992 until late August, 1993, when he returned to work earning reduced wages. Plaintiff was temporarily partially disabled from late August, 1993 through the date of the hearing before the Deputy Commissioner, 13 January 1994, with the residual capacity to earn $450.00 per week, rendering a compensation rate of $66.66 per week. N.C. Gen. Stat. §§ 97-2 (9); 97-29; and 97-30.
2. The employer's Form 24 application to stop payment of benefits dated 10 March 1993 was improvidently granted.
3. Plaintiff is entitled to total disability benefits for the period 27 March through 29 August 1993. N.C. Gen. Stat. § 97-29.
4. Plaintiff is entitled to medical compensation reasonably necessary to give relief from the compensable injury, including the disputed charges of Dr. Ferre. N.C. Gen. Stat. §§ 97-25;97-2 (19); Forrest v. Pitt Co. Bd. of Education, 100 N.C. App. 119,127, 394 S.E.2d 659 (1990); Davis v. City of Charlotte,
I.C. No. 865291, 8 March 1991.
5. Any issues concerning a substantial change in plaintiff's condition effecting disability or compensation due after 13 January 1994 which have or may arise must be reserved for subsequent determination upon application of the parties. N.C. Gen. Stat. § 97-47.
* * * * * * * *
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
AWARD
1. Subject to attorney's fees hereinafter awarded, defendants shall pay to plaintiff temporary total disability benefits at the rate of $366.67 per week in respect to the period 26 March 1993 through 29 August 1993, and temporary partial disability benefits at the rate of $66.66 per week for the period beginning 30 August 1993, through 13 January 1996, and continuing during his temporary partial disability. Amounts accrued shall be paid in one lump sum. This award is made without prejudice to either parties' right to show a change in condition after 13 January 1996.
2. Defendants shall pay all medical compensation expenses incurred by plaintiff as a result of his compensable injury, when the same have been submitted to the carrier and approved according to the rules of the Commission, including the disputed medical treatment provided by Dr. George A. Ferre, and the physical therapist to whom he referred the plaintiff, which should be, and hereby is, APPROVED.
3. A reasonable attorney's fee of twenty-five percent (25%) of the compensation herein awarded plaintiff is approved, and defendants shall deduct and pay directly to counsel for plaintiff twenty-five percent (25%) of any amount accrued, and thereafter every fourth compensation check due plaintiff shall be paid directly to plaintiff's counsel.
4. Defendants shall pay the costs due this Commission.
 S/ __________________________ J. RANDOLPH WARD COMMISSIONER
CONCURRING:
S/ ___________________________ J. HOWARD BUNN, JR. CHAIRMAN
S/ ___________________________ GEORGE T. GLENN II DEPUTY COMMISSIONER
JRW:md 01/9/97 JRW